Good morning, Your Honors. May it please the Court, my name is Susan Hill and I represent the petitioners, Mr. Avetisyan and his wife, Ms. Stepanian. Your Honors, we're here because the I.J. improperly made an adverse credibility determination, Mr. Avetisyan's claim for asylum and related relief. The I.J.'s adverse credibility decision did not adequately state enough facts to support the decision. It referred to vague and general concepts such as he was not cogent and that he was not understandable, but the judge pointed to very few instances in the record, if any at all. The first instance was the judge did not understand why Mr. Avetisyan had engaged in an altercation with military officers after he had stopped them, or tried to stop them from conscripting the refugees improperly. The altercation took place in his own office after he invited the officers up to discuss the matter. When he confronted them and pointed out that what they were doing was illegal, understandably they became upset with him and I think that was when he was threatened and pushed. He tried to get away and stepped outside of his own office to escape this treatment, and he was stopped by a police officer and another military officer in the hallway, and that is when he was attacked. The judge stated he did not understand why this altercation would take place, however I think the record shows that it is very understandable that the military would or these officers would respond in that manner when confronted with their illegal activity. Then after he was beaten, he was injured severely and he showed his injuries to the military officers. The judge also found that to be not believable, but I do believe the record supports that his actions in doing so were reasonable or at least believable. The officers or let me back up. The background country condition reports do show that the military has a reputation for being rather abusive towards detainees and towards conscripts in general. In this case, Mr. Abitissi was not a conscript, but he was attempting to protect targeted conscripts. They do have a reputation for abuses. They had just injured him and he was very he was he believed he was injured severely to the extent that he the military would, I don't know if they did ask or not, but that they would examine his injuries perhaps to determine the severity of these injuries and whether these particular individuals may be in trouble for what they had done to him. There was some documentation confirming a groin injury? Yes, there was, Your Honor. There's a medical certificate in the record. I can give you that page site if you want. And the injury was severe enough that he required 10 or 11 days of hospitalization. It was a very severe injury. So it makes sense that he would point this out or at least that it would come to the attention of the military officers. He spent some time in the hospital. It was severe. He did recover. And later on, there was another incident in the next year where the military did come again and tried to conscript or I think they actually did conscript some refugees. Mr. Avatician was afraid to do anything at that time himself as an individual because he had been severely beaten in the past. Therefore, he went to a television station and this was set forth in his asylum application as well as in testimony. He went to a television station and he explained the reason he chose that station was because it had what he described as an investigative reporting television show on the station. The station met with him, sent out a reporter the next day who interviewed him. The judge found great trouble with whether Mr. Avatician was interviewed on camera as that term was used in his testimony. In the brief, I believe the record does show that he did say he was interviewed on camera, but he confirmed that his interview never was used in his testimony. Finally, the judge, his decision, it focused mainly on the adverse effect of the military on him. Mr. Avatician's discharge from the hospital until another event in May of 2000. Well, the television interview did happen at that time, although I do note that he did not incur any physical harm from the military between the two time periods. So the next time he had physical contact with the military officers was in May of 2000 when again they tried to engage in this illegal conscription and he again tried to stop them and he was threatened and grabbed by the throat, he was insulted, and he was told next time it's going to be your life if you keep interfering like this. So Mr. Avatician understandably was afraid and fled Armenia and came here and claimed political asylum. Now the judge did not directly assess that incident, but aside from the confusion that he expressed with the May 1998 incident as to why they were engaging in altercation in his confusion with the television interview, those were really the only two points in testimony that the judge specifically referred to. If you're right on the credibility determination, then is the, am I correct that the solution is to remand for reconsideration on the merits of the claims? Your Honor, the judge did have an opportunity to address the merits of the claim. However, he said, I do not believe he has met his burden of proof. It's possible that the reason he came to that conclusion was because he did not find the testimony credible and he did not engage in a specific analysis of the elements of asylum. However, the Board of Immigration Appeals had opportunity to review the claim and they were presented with the arguments as to why Mr. Avatician qualifies for asylum. Instead, they issued a summary affirmance, which just said they affirmed the decision reached by the judge. So the BIA did have opportunity to address those arguments, and unfortunately, under the summary affirmance regulations, it's unclear whether or not they did. Therefore, I think this Court does have jurisdiction, or they are, this Court is able to. We're not concerned about the jurisdiction. I'm sorry, I didn't mean. Shouldn't we, under Ventura, remand for a determination on the merits of the – of whether he's eligible for relief? I believe this Court is able to make that determination itself because, as I said, the BIA was presented with the arguments and the summary affirmance regulations cloak their reasoning, and it's unclear whether or not they did make that determination or not. Wouldn't it go back with the – I should apologize for pleading confusion out of our own cases, but these remands under Ventura, as I understand it, we send it back to say that we agree that he qualifies for asylum, but there's still – don't you have to then proceed to the next step about finding a well-founded fear of future prosecution and that? Isn't that what would go back? How did the BIA or the I.J. have the opportunity? In Mr. Avitisian's – It's different from any other case where there was essentially, you know, the I.J. finds them not credible and we reverse the credibility finding. Right. And, again, the summary affirmance procedure is the intervening act here in that the arguments were presented to the BIA, but they do not clearly state – I understand your point, but I don't understand in light of our case law where we routinely impose this Ventura remand. What's different about this case from the cases where we in published cases have remanded? And I'm sorry if I'm misunderstanding and belaboring the point, Your Honor, but under summary affirmance, the BIA just agrees with the conclusion reached by the I.J., not just reasoning. The I.J. made it an adverse credibility determination. That meant there was no evidence in the I.J.'s mind to support eligibility for asylum. Therefore, the I.J. never made a determination. This I.J.'s decision is a very odd one in that he keeps saying, well, I really didn't understand what was being said, so I don't have any basis to grant relief. It's the oddest I.J. decision, I think, that I've ever seen, or one of the oddest. Yes, and that aside, my point is that the I.J., in his own mind, thought he had no evidence in front of him. So I don't understand how we can now make a decision when he never made it. Because, Your Honors, I understand the summary affirmance regulation. They affirm the conclusion, not necessarily for the reasons reached by the I.J. My point is they're affirming a decision that there was an adverse credibility determination. I think they're affirming a decision that asylum was denied, and not for the reasons. Okay, but still, my understanding is if we don't buy the credibility determination, then the remand goes back on the assumption that he has established grounds past persecution to warrant discretionary asylum relief, correct? And that then you have the question as to whether he's then entitled to withholding of removal, which then opens up the potential for change country conditions, fear of future prosecution. Am I wrong about that? That is the analysis, yes, Your Honor. Okay, so the remand that we've been talking about, at least in my mind, is that under the Ventura Doctrine, if we want to call it that, that's the kind of remand that would be appropriate here if we agreed that the reason for the I.J.'s denial of asylum and the BIA summary affirmance isn't sustained on the record, that is lack of credibility. So now he goes back with the presumption of past persecution, the burdens on the government, to establish that that still shouldn't entitle him to withholding of removal. At least that's my understanding. Is that what you're you think the proper remand would be? I believe that, again, I stick with my proposition that the BIA had opportunity to determine all those issues. To determine whether he had a well-founded fear of future process? Yes, Your Honor. Okay. I reserve the remainder of my time. Thank you. Mr. Braunstein. May it please the Court. I am Josh Braunstein for the Attorney General. I'd like to address the potential for remand in the first instance, but not because I don't think that this is a sustainable decision. In fact, I think and I will endeavor to demonstrate that the record does support the I.J.'s finding. However, it should be made clear that if the Court finds that the evidence compels the conclusion contrary to the immigration judge's, then under Ventura it should be remanded, but with no presumption in the petitioner's favor whatsoever. The immigration judge should be afforded the opportunity under the express language of Ventura to restate his decision and then to address the issues that the immigration judge has not yet addressed. And I agree that this case is limited to an adverse credibility finding. So the I.J. would now get back and be told that he hasn't sustained on the record his finding, adverse credibility finding. So now he gets to go back and now find not credible based on a restatement of his rationale? I don't read Ventura. That's... Well, I respectfully... If they don't get to address the issue, but he's addressed the issue of credibility, so he can't now go back and paste up the record in light of an advisory opinion from this? Yes, Your Honor. My recollection of Ventura is that it absolutely permits the I.J. to address those issues, but I believe it also states that he can restate his decision. And in this case, I think although the immigration judge's decision is not what I would call the model, the paradigm for an adverse credibility finding, I think it is well supported by the evidence. And it is borne out by the fact that... But primarily, he said, I don't understand how all of this came down. And I don't know, reading it, I have absolutely no trouble understanding what the petitioner was saying. I mean, he's saying that he was accosted by the military and given a significant injury for trying to protect the kids who were in his custody from being taken and recruited by the military, that he went to the U.N. and squawked about it, and he went on, interviewed a television reporter and squawked about it, and that his house was burned down after he left the country. Now, that's what he said, and I don't see any trouble understanding it. Well, Your Honor, that is not an unreasonable construction of his evidence. However, I would note that the record makes clear one thing. If it was clear to you, it was not clear to two people in that courtroom, one of which was his own attorney. There are many instances in the record when his own attorney turned to him and said, I don't understand what you're talking about. He may have the same problem that the I.J. has. That doesn't mean that it's well founded. Well, the Petitioner carries the burden of persuasion, Your Honor, and he runs the risk of non-persuasion. And when he testifies Yes, Your Honor. Now, if you do a fair reading of this transcript, the I.J. was dismissive and hostile and didn't really listen to what was said. It's a very odd case, and I think you ought to recognize what you've got before you, which is an I.J. who says, well, I don't understand. Well, it was clear. It was there. Well, Your Honor, there are other things that go on in the court and that aren't apparent on the cold record. His own attorney became frustrated with him at many turns. And I can point to many instances where his own attorney was frustrated, and it's because he was not answering the questions asked to him. And when he answered a question, he would often interject totally nonsensical answers and responses. And I would note a couple of them. Give us a few examples, would you? Yes, ma'am. I've read this transcript. Yes, Your Honor. Page 195 of the record at the top. He's asked what happened. He had just testified about what happened with the groin incident and the hospitalization. So he's asked what happened. His response is totally unintelligible. He says, as I turn to it, on the bottom of 194, what happened after 1998? His answer, the incident of 98 in the hospital when I, indiscernible, and they came to the refugees. And after they saw me, they asked me what they could do. I told them to go to this refugee center. Now, I don't know what that means. And his attorney, his own attorney said, sir. Where were you reading? On the top now of 195, Your Honor. His own attorney says, sir, pardon me, what are we talking about? I want to know, did anything happen after this discharge from the hospital? Did something else happen? That's my question. So then he just blurts out, May 2000, same thing happened all over. His attorney again, hold on, sir. What's going on? So the IJ, not only is it the IJ, you know, and the IJ in his decision said nothing happened for two years. The counsel made much of the fact that there was something that happened in 99, but it wasn't clear from his testimony because it's so meandered. But, indeed, he was not injured, allegedly, at any time. I would also point to page 196 of the record where I submit that his testimony fell off a cliff. Because he is asked, he is asked, but you had no problems during that period, and that is at the top of 196. His answer, at that time they asked me again to go bring those kids back because the first time I brought seven out of 11 kids. Then his attorney says, wait a second, and I'm quoting, wait a second, sir. I don't believe there's any testimony going to ask you to bring anybody anywhere. So, again, his own attorney doesn't know what he's talking about. And then, again, he goes back to that. Now he's talking about October 99. And he says something that doesn't make very much sense and is out of context. And then, again, his attorney says, I don't understand what you're saying. Who asked you? Who asked you? And so what we have is a courtroom where the petitioner can't seem to answer a question asked to him. Again, on page 197, he's there talking, he's talking vaguely about what happened with these parents and these children. And you go to the top of page 197, he's asked, did you do anything? And that's when the parents evidently came to him. If you read it three times, you can make some sense of it. But this is happening in real time for the I.J. And he's got to prove his case. His response to what happened is, no, they were telling me that the kids were being beat up and they were beat up and forced to sign these voluntary joining papers, but I was afraid to go there. His attorney, again, wait a second, sir, you didn't answer my question. This is the fourth time his attorney said, wait a second. Now, he says, did you do anything? Now, he wants to ask him the same question again. Did you do anything as a result of the request? And then he said, I couldn't do anything because I was afraid. Now, at this point, he has said he's too afraid to do anything. And this is where the implausibilities begin in earnest. He says that instead of, okay, so you didn't, and he answers, I went to the TV station. Now, the I.J. interjects, wait a minute. And I'm quoting, wait, you're too afraid to do anything, but you went to a TV station? And then he goes back and forth on page 197 and 198, talking about this TV station vaguely and reentering back. And in the middle of page 198, he's asked about, by his lawyer, I believe his lawyer, all right, no, it's the judge now, all right, this is the top of 198. So he went to the TV station. Did they send the journalist over there? And what follows next is a meandering soliloquy that makes no sense. He says, I went to TV station October of 99. Then he goes back. Now, the next sentence, he's going back to 98. When I was released from the hospital, I went to the U.N. office. And then he's talking about this representative of the U.N. office back in 1998 and how this woman managed to get these children, refugees, out of the military. He's gone back a year in time in response to a question of what happened at the TV station. So the question to witness on cross or direct? Yes, Your Honor. I was a prosecutor. Would you be nonresponsive to your question? Well, Your Honor, I would prepare my witnesses as well as I could. You would. And in this case, this Petitioner, that's the point. It's his burden. And he doesn't seem to be able to, with the assistance of his attorney, to pull together a coherent story. And so what we have is a record that – and this isn't the last of it. I mean, there's more. And then the I.J. says, look – he says to the attorney, look, at the bottom of page 198, I don't know what you're talking about. And he's trying to get him to focus. The attorney says, Your Honor, quote, I can say actually this U.N. office is news to me, Judge. And the judge says it's mystifying. Now, both attorney and judge are totally befuddled about this testimony. So, Judge Fletcher, if it's an odd I.J. decision, it is by virtue of the fact that this Petitioner's testimony was absolutely all over the board, and he could not seem to answer the questions asked to him. And it's not the immigration judge's obligation to create a credible record. So I want to note – I see my time is running out. I want to note that not only are there implausibilities throughout the record, one of which is that the visit to the U.N. is absolutely absurd. He says that he went to a TV station, even though the U.N. had previously been successful in releasing these children without any trouble or repercussions. But he said the next time he went to the U.N., he didn't know the people. They'd all moved out. Well, Your Honor, that's – again, he didn't know the people the first time he went. So his response is totally – it's totally – Why is that? I mean, he goes the first time. He builds a relationship. He goes back the next time. There's a whole different set of people. Circumstances have changed. Well, again, Your Honor, I would submit that if he went the first time, he didn't know anybody, and that would help. I don't see why it makes any sense that the second time he went, he didn't know anybody. No, you're speculating. Now, you're speculating, and that's exactly what our case law says the I.J. can't do. You can't just speculate and make up a reason and say, okay, I don't – you haven't ruled out all possibilities. Well, Your Honor, I believe it's a reasonable – the only reasonable conclusion. But I want to note one major inconsistency in the record, if I could have just another moment, and that is with respect to whether he appeared on this camera in this interview. Ms. Hill has suggested that his testimony was clear. I agree with the exchange on the camera. And since your time is up, maybe you might just want to wrap up. Very well, Your Honor. I think that with the unmistakable inconsistency at page 204 when he says he was on camera and off camera, and it is not arguable either way that he did not – the other way, they did not say that. And in light of all of the serious problems with his attempts to and failed attempts to make a coherent story that anyone could understand, including his lawyer, we believe that you should deny the petition for review and uphold the immigration judge's adverse credibility finding. But if you do not, then remand is appropriate. Thank you. Thank you, Your Honor. Ms. Hill, your time has expired, but we'll equalize the time and give you another minute. Thank you, Your Honor. Your Honors, I would just like to point out that the position of the government is that testimony can never ever be clarified if it initially is confusing by virtue of his own attorney perhaps saying, I didn't understand that last question. Supposedly now the attorney or the client at least is forever barred from being able to clarify what he may have said earlier that no one understood. He should be allowed to clarify his testimony, and whoever it is in court should be able to ask him to clarify his testimony without him being punished for that. And he ultimately did clarify his testimony, as I argued earlier. Finally, again, the government proceeds on a presumption that Mr. Avitissian's attorney was well-prepared. Who's to say whether he was well-prepared or not? It's not in the record. And no one asked, and Mr. Avitissian did not have, or at least the record did not have, any showing of how well-prepared the attorney was. Therefore, the attorney's surprise at answers should not be adversely attributed to Mr. Avitissian. Thank you very much. All right. Counsel, the matter to be argued will be submitted. And we'll next hear argument, United States v. Delgado.
judges: B. Fletcher, Rymer, Fisher